UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

HARVEY PHILLIP HESTER,     )
                   )
     *Petitioner*,     )
v.                  )    No. 1:07-cv-153
                   )    *Judge Mattice*
CHERRY LINDAMOOD, Warden     )
                   )
     *Respondent.*     )

## <u>MEMORANDUM AND ORDER</u>

Harvey Phillip Hester ("Hester") was convicted by a jury on September 15, 1995 of

two counts of second degree murder and one count of attempted second degree murder

in the Criminal Court of Hamilton County, Tennessee. Hester has brought before this

Court a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Court Doc. 1] by

which he seeks review of his state court convictions. Presently before the Court is the

Motion to Dismiss of Respondent Cherry Lindamood [Court Doc. 8].

After reviewing the record and the applicable law, and for the reasons explained

below, the Court concludes that the Respondent's Motion to Dismiss is well-taken and will

be **GRANTED**. Accordingly, Hester's § 2254 petition will be **DISMISSED**.

## I.    FACTUAL BACKGROUND

The following facts were recited by the Court of Criminal Appeals of Tennessee on

direct appeal:

> On August 8, 1994, Richard Serna (Richard), his daughter, Angela, and his
> brother, Paul Serna (Paul), drove to the "blue hole" on Suck Creek Road at
> Signal Mountain to swim. Upon their arrival, the defendant was in the parking
> lot. Richard Serna briefly engaged in friendly conversation with the defendant
> after which the Sernas walked to the swimming area. Sometime later, the

1

defendant approached them and asked if they had seen his wallet. The defendant searched unsuccessfully for his wallet and then left. Angela described this exchange as "pleasant."

About five minutes later, the defendant returned and again inquired about his wallet. He pointed out that the Sernas were the only others in the area and explained that his wallet contained around $2,200. The defendant left but soon returned and insisted his wallet had to "be here somewhere." When he mentioned that he had a gun in his car, the Sernas were surprised. Paul placed a knife in his pocket but made no threats to the defendant.

After the defendant left, the Sernas gathered their belongings and returned to their car. When they reached the parking lot, the defendant asked permission to search. While the Sernas allowed a search, the defendant did not find his wallet. The Sernas then drove away. After driving on a short distance, the Sernas noted the defendant was following them. He rammed the back of their car several times and, at one point, the Sernas' car "fishtailed" around a bigger truck.

At trial, Angela testified that the defendant struck their vehicle in the rear "over and over again ... continuously the whole way down the mountain." She estimated that their vehicle was struck more than twenty times. As their car passed by the Suck Creek Boat Ramp, Angela yelled out the window asking for someone to call the police.

She recalled that at the bottom of the mountain, Suck Creek Road terminates at its intersection with Signal Mountain Boulevard, a four-lane road. She remembered that the defendant rammed their car into the four-lane road. At another intersection, only a short distance away, Richard and Paul Serna stopped their vehicle and confronted the defendant. Paul drew his knife from his pocket but held it to his side. Angela testified that an argument ensued about the wallet but that her next memory was waking up in the hospital. Initially unable to recognize her mother, Angela Serna had suffered a broken pelvic bone and a broken leg. All of her facial bones were broken. She required bone graft surgery on her nose.

James Pilkington, who observed the confrontation at the intersection of Mountain Creek Road and Signal Mountain Boulevard, testified that the Sernas appeared to be frightened. When Pilkington stopped at a nearby Conoco to call the police, he noticed the Sernas' vehicle drive by and thought the altercation might have ended. When he drove around a curve, however, he saw that the Sernas had been involved in a wreck.

Mark Payne, who also saw the confrontation between the Sernas and the defendant at the intersection of Signal Mountain Boulevard and Mountain Creek Road, testified that either Richard or Paul was standing on the side of the road with a terrified look on his face. He saw that individual run and then observed the driver of the Serna vehicle stop to allow him to enter. The defendant's vehicle "shot right through the light and started chasing [the Sernas'] Nissan." Payne described the defendant as "chasing [the victims] down." Michael Eugene Hood, who also witnessed the confrontation at the intersection, corroborated Payne's version of the events.

James DeSha, who was traveling on Signal Mountain Boulevard on the day of the wreck, testified that he saw a white Cutlass ram a red Nissan Pulsar on two occasions. He also saw the Cutlass move to the outside lane to the right side of the Nissan and "turned in on him," ramming into the back bumper of the Nissan, spinning it sideways. He recalled that the Sernas' Nissan slid sideways, became airborne, flew across a red Thunderbird, and onto the hood of a green Dodge. DeSha claimed that the defendant, who was driving the Cutlass, grinned as he drove away at a high rate of speed. DeSha was able to get the license plate number of the Cutlass.

Officer Charles Russell of the Chattanooga Police Department investigated the accident. He found three cars with "a considerable amount of damage." The victims' car contained several beer cans. At approximately 1:00 A.M. the day after the wreck, he located the Cutlass driven by the defendant. The license tags had been removed. While there were no dents to the front of the defendant's car, the front right fender did have a presence of red paint, the color of the Serna vehicle. The defendant, who had suffered a black eye, voluntarily turned himself in to police.

Dr. Charles Harlan performed an autopsy on Paul Serna. Death resulted from a ring fracture of C-1 and C-2 cervical vertebrae, which is the area where the skull fits on to the vertebral column. His blood alcohol content was .03 percent, which indicated he had consumed less than two units of alcohol.

Richard Serna, who had a blood alcohol content of .032 percent, was a quadriplegic due to the brain injuries suffered in the accident. He died on January 20, 1995, several months after the car wreck. According to Dr. Frank King, the Hamilton County Medical Examiner, the cause of death was "acute bronchial pneumonia due to chronic medical debilitation due to head injury."

Attorney Joe McBrien, who represented the defendant in a civil case, appeared as a defense witness. He testified that the defendant had received a settlement award of $3518.75 six days before this incident. He recalled that the defendant received cash in that amount.

John Hackney, who lived at the foot of Suck Creek Mountain, was traveling to his residence on the day of the wreck, when he passed a car and then saw a billfold "blow up in the air." He stopped his vehicle and found the billfold and large denominations of cash lying on the ground. He testified that he picked everything up and left. The identification in the billfold was that of the defendant. Hackney admitted that he kept the money. He burned the wallet. He conceded that he had bragged to his co-workers about finding the cash, which is how the defense attorneys eventually located him. He acknowledged that he never notified the police about finding the wallet.

Terry Thurman, who testified through an interpreter, recalled that she saw the defendant and the victims in a confrontation at an intersection on Signal Mountain Boulevard. She observed one of the Serna men holding a knife up in the air.

David Blackburn testified that he was with the defendant at the time of the wreck. An individual named John and a girl whose name he could not recall were also present. Blackburn recalled that the defendant had a large amount of money in his possession before they went to the swimming hole. Blackburn testified that he separated from the defendant and then saw him in the parking lot. His eye was swelling shut and his nose or mouth was "busted." The defendant claimed that the people pulling away in another car had just robbed him.

Blackburn testified that the defendant followed the Sernas down the mountain and bumped their car several times. When they reached Signal Mountain Boulevard, the defendant and John got out of their vehicle. He saw one of the Sernas approach waving a knife; when the Sernas returned to their vehicle, the defendant continued to follow them. Blackburn testified that he suggested that the defendant continue to follow so they could eventually call the police. Blackburn claimed that the driver of the Nissan kept swerving in and out in an attempt to keep the defendant from driving alongside. He testified that after the accident, the defendant drove him to his car. Blackburn was charged with "accessory after the fact" but the charges were dismissed. He acknowledged prior convictions for theft, robbery, and drug-related offenses.

*State v. Hester*, 1998 WL 288711  (Tenn.Crim.App.,1998).

## II.    PROCEDURAL BACKGROUND

On September 15, 1995, Hester was convicted by a jury on two counts of second

degree murder and one count of attempted second degree murder.  He received

4

sentences of 25 years on each of the second degree murder convictions and 12 years on the attempted second degree murder conviction. Because each such sentence was run consecutive to the other, Hester was sentenced to an effective term of sixty-two years imprisonment. Hester appealed his convictions to the Tennessee Court of Criminal Appeals. That court, relying on Tennessee case law, reversed the two second degree murder convictions, concluding that the trial court had invaded "the province of the jury" by not giving the jury the option of finding Hester guilty of vehicular homicide. *State v. Hester*, 1998 WL 288711 (Tenn.Crim.App. June 4, 1998). On appeal, however, the Tennessee Supreme Court remanded the case for reconsideration in light of its opinion in *State v. Dominy*, 6 S.W.3d 472 (Tenn. 1999)(lesser grade of an offense is not the same as a lesser included offense), which was released more than a year after entry of the appellate court's original order. *State v. Hester*, 1998 WL 288711 (Tenn.Crim.App. 1998), *perm app. granted* (Feb. 7, 2000). On remand, the Court of Criminal Appeals concluded that the trial court did not commit error by refusing to charge the offense of vehicular homicide, a lesser grade of the offense but not a lesser included offense, and affirmed Hester's convictions. *State v. Hester*, 2000 WL 294964 (Tenn.Crim.App. March 22, 2000).

Hester delivered his state petition for post-conviction relief to prison authorities on December 10, 2001. After conducting a hearing, the post-conviction court entered an order on May 18, 2005 granting relief on the basis that Hester received ineffective assistance of counsel when trial counsel argued he was innocent of all charges and voluntarily waived his right to a twelve-member jury. The Tennessee Court of Criminal Appeals, however, reversed the lower court's decision, concluding that Hester was not

5

entitled to any relief. The Tennessee Supreme Court denied permission to appeal. *Hester v. State,* 2007 WL 465104 (Tenn.Crim.App. Feb. 13, 2007) (*perm. app. denied* June 18, 2007).

## III. STANDARD OF REVIEW

Hester may obtain habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Proceedings in the United States Districts Courts, this Court is to determine, after a review of the response, the transcript, the record of state court proceedings, and the expanded record, whether an evidentiary hearing is required. If a hearing is not required, the district judge is to dispose of the case as justice dictates. The Court finds it is unnecessary to hold an evidentiary hearing in the instant case.

The decision of the state appellate court that counsel was not ineffective for arguing innocence rather than reckless homicide, and that Hester voluntarily waived his right to a 12-person jury, is reviewed by this Court under 28 U.S.C. § 2254(d), which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). That statute limits a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based

6

on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

When analyzing an ineffective assistance of counsel claim, the Court deals only with what Justice O'Connor has called the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 411-413 (2000). Under that standard "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 413. The Tennessee Court of Criminal Appeals correctly identified the rule of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), as the rule governing its decision as to whether Hester did or did not receive effective assistance of counsel. It concluded that counsel's decision to argue during closing argument that Hester was guilty of no crime was a strategic decision that should not be second-guessed by a reviewing court. *Hester v. State*, 2007 WL 465104, *10 (Tenn.Crim.App. Sept. 26, 2006) (*perm app. denied*, Feb. 13, 2007). The issue here, then, is whether the Tennessee Court of Criminal Appeals unreasonably applied the *Strickland* standard to the facts of Hester's case.

In making this determination, this habeas court must be mindful that there is a difference between an incorrect application of federal law and an unreasonable application of such law. *Williams v. Taylor*, 529 U.S. at 410. This Court cannot issue the writ if it concludes merely that the state court applied *Strickland* erroneously or incorrectly. Rather, the writ may not be issued unless the state court application of the law was unreasonable. *Id.* at 411.

7

Moreover, federal habeas courts must defer to state court factual findings, according them a presumption of correctness that the habeas petitioner may rebut only with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption only applies, however, to underlying basic, primary, or historical facts, and not to mixed questions of facts and law. *Rickman v. Bell*, 131 F.3d 1150, 1153 (6th Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998);*West v. Seabold*, 73 F.3d 81, 84 (6th Cir.), *cert. denied*, 518 U.S. 1027 (1996). Ineffective assistance of counsel in a petition for habeas corpus review presents a mixed question of law and fact. *West v. Seabold*, 73 F.3d at 84. Therefore, a state court's conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal habeas court to the extent stated by 28 U.S.C. § 2254 (e)(1). Thus, to obtain relief, Hester must show, by clear and convincing evidence, that the state court's factual findings were unreasonable, or that the state court's adjudication of the claim resulted in a decision that involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).

As to Hester's second issue, that he did not knowingly waive his right to a twelve-person jury, the State courts did not identify any United States Supreme Court case, but rather focused on state cases and Tennessee Rules of Criminal Procedure. Generally, federal habeas courts cannot review claims that the state court has disposed of on state law grounds, *see Lambrix v. Singletary*, 520 U.S. 518, 523-24 (1997) (noting that where "the state law determination is sufficient to sustain the decree, any opinion ... on the federal question would be purely advisory"), if the state court decision rests on state law that "is

independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

Thus, and although claims alleging a violation of state law are generally not subject to review in federal habeas proceedings, *Pulley v. Harris*, 465 U.S. 37, 41 (1984), they may be subject to federal habeas review if they rise to the level of a denial of rights protected by the United States Constitution. *Barclay v. Florida*, 463 U.S. 939, 958-959 (1983). In other words, even though "federal habeas corpus relief does not lie for errors of state law[]" because "it is not in the province of the federal habeas court to reexamine state-court determinations of state-law questions[,]" *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), federal habeas courts may consider claims of state law error only to correct wrongs of constitutional dimension. *See Smith v. Phillips*, 455 U.S. 209, 221 (1982).

In this case, Hester contends he did not knowingly, intelligently, and voluntarily waive his right to a twelve-member jury. Hester couched this claim in terms of ineffective assistance of counsel, but the post-conviction trial court denied relief concluding that any deficiency in counsels' performance was not prejudicial. Although Hester did not raise the issue in any other context, the post-conviction court additionally considered whether his waiver was knowing, voluntary, and intelligent and the appellate court chose to address the post conviction court's analysis, concluding that Hester did, in fact, knowingly, voluntarily, and intelligently waive his right, and reversed the grant of post-conviction relief.

Accordingly, this Court will analyze the claim to determine if there was a constitutional error. The Court may not grant habeas relief on this claim, which was adjudicated on the merits in state court, unless the state court's decision was contrary to,

or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts. On habeas review, the state court's determination that a Hester's jury trial waiver was valid, after conducting an evidentiary hearing into the matter, is a finding of fact entitled to a presumption of correctness pursuant to § 2254(e)(1), unless the Hester can overcome this presumption by clear and convincing evidence. *Spytma v. Howes*, 313 F.3d 363, 371 (6th Cir. 2002).

## IV.    PROCEDURAL DEFAULT

Although he raises numerous grounds for ineffective assistance of counsel and an involuntary waiver claim, only two claims—one of the ineffective assistance of counsel claims and the involuntary waiver claim—are properly before this Court, because they are the only two claims appealed, albeit by the State, in Hester's state post-conviction case. The state post-conviction trial court entered an order granting relief on these two claims, but during the appeal of the state-post conviction case by the State of Tennessee, the Court of Criminal Appeals determined Hester was not entitled to relief and reversed the lower court's order. The Tennessee Supreme Court denied permission to appeal on June 18, 2007, *Hester v. State*, No. E2005-01607-CCA-MR3-PC, 2007 WL 465104 (Tenn. Crim.App. Feb. 13, 2007) (app. denied June 18, 2007), and Hester filed the instant habeas petition on June 19, 2007.

In the addenda to his petition for writ of habeas corpus, Hester states his first ground for relief is based on counsel's alleged ineffectiveness for failing to argue reckless homicide. This claim is properly before the Court. However, Hester also raises claims incorporated from his state post conviction petition, most of which were not raised in the

10

Tennessee appellate courts.[1]   Nevertheless, Hester's counsel argues Respondent's assertion—that the claims that were abandoned during the appellate process but listed in Hester's current petition as matters previously raised and incorporated by reference as current grounds for relief are procedurally barred—is incorrect and clearly belied by the record.   Only the claims relating to trial counsel's failure to argue reckless homicide and the voluntariness of Hester's waiver are  properly before the Court because these are the only two claims raised in the Tennessee appellate court.[2]

To avoid procedural default, a habeas petitioner must, at minimum, "invok[e] one complete round of the State's established appellate review process" for each of his claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, (1999).  Rule 39 of the Rules of the Supreme Court of Tennessee provides that "denial of relief by the Court of Criminal Appeals shall constitute exhaustion of state remedies for federal habeas corpus purposes."  Thus, in Tennessee, this means Hester must at least file an appeal in the Court of Criminal Appeals.  In the instant case Hester did not appeal the so-called "incorporated claims" to the Tennessee Court of Criminal Appeals.  Thus, unless he meets the criteria explained below, these claims are procedurally barred from habeas review.

If a Hester fails to fairly present his federal claims to the state courts in accordance with the state's procedural rules, he forfeits the right to federal habeas corpus review of those claims unless he can show cause for his non-compliance and actual prejudice as a

---

[1]       The two claims properly before this habeas Court are, at least in part, included in sections i, l, and m.

[2]       The State appealed the post-conviction court's decision.  Hester did not appeal the State post-conviction court's decision (Addendum Nos. 20-22).

11

result of the claimed constitutional violation, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *Engle v. Isaac*, 456 U.S. 107, 129 (1982), or if he establishes that the failure to review his claim will result in a miscarriage of justice, such as when he can demonstrate a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *See Schlup v. Delo*, 513 U.S. 298, 314 -15 (1995); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

In the instant case, Hester has failed to appeal his issues "incorporated by reference" from his state post-conviction petition to the appropriate state appellate courts. Although those issues were presented in the post-conviction court, they were not properly raised in the Court of Criminal Appeals. Thus, since they were not preserved for federal review, *O'Sullivan v. Boerckel*, 526 U.S. 838, 845-47 (1999), and since Hester has not shown cause and prejudice or a fundamental miscarriage of justice, the "incorporated by reference" claims are procedurally defaulted and are procedurally barred from habeas review.

## V. ANALYSIS

Hester raises a claim of ineffective assistance of counsel and involuntary waiver of his right to a twelve-member jury. The Court will address each claim in turn.

### A. Ineffective Assistance of Counsel

Hester contends he received ineffective assistance of counsel when counsel unilaterally decided to abandon the defense of vehicular homicide and argue that Hester was actually innocent as to all charges, even though the evidence, at a minimum, established reckless homicide.

12

1. Applicable Law

The criteria for analyzing a claim of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668(1984). *Strickland* requires a defendant to demonstrate two essential elements: (1) counsel's performance was deficient (i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment), and (2) counsel's deficient performance prejudiced the defense ( i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable). *Id.* at 687-88; *see also McQueen v. Scroggy*, 99 F.3d 1302, 1310-11 (6th Cir.1996), *cert. denied*, 520 U.S. 1257 (1997); *Sims v. Livesay*, 970 F.2d 1575, 1579-81 (6th Cir.1992); *Flippins v. United States*, 808 F.2d 16, 17-18 (6th Cir.), *cert. denied*, 481 U.S. 1056 (1987).

"Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir.1997) ( citing *Strickland*, 466 U.S. at 687); *United States v. Cronic*, 466 U.S. 648, 658 (1984); *McQueen*, 99 F.3d at 1310-11). The Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 699.  As the *Strickland* Court explained:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Id.* at 690-91.   Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy

13

choices." *Id*. at 690. Therefore, Hester cannot prevail on an ineffective assistance of counsel claim merely because he disagrees with his counsel's strategy. "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

Moreover, even if counsel's strategic decisions are found to be unreasonable, habeas relief is not warranted unless prejudiced is proved. To establish the prejudice prong, Hester must show that the deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Hester must meet his burden of establishing both the cause and prejudice prongs to warrant relief. If either prong is not satisfied, the claim must be rejected.

<h3>2. State Court Decisions</h3>

In his state post-conviction petition, Hester made several claims of error against trial counsel. The post-conviction court concluded counsel erred by abandoning an intent theory—that Hester had not intended to kill the crash victims, but only to stop them—and adopting a causation theory—that Hester did not cause the wreck or the deaths (Addendum No. 18, p. 143). It was the post-conviction court's opinion that rather than pursue a theory of absolute innocence, trial counsel "should have acknowledged Hester's apparent errors in judgment as recklessness or negligence." (Addendum No. 18, p. 145). The post-conviction court then considered whether the deficiency was prejudicial by examining the defense strategy in terms of overall credibility of the defense presentation.

14

The post-conviction court concluded, in effect, that defense counsel did not pursue a credible defense:

> As Mr. Poston ([the *Strickland*] defense expert witness,) observed, during the trial, the credibility of the defense was diminished by counsel's cross-examination regarding the victims' consumption of alcohol and subsequent unsuccessful attempts to exclude evidence of the victim driver's negligible blood alcohol levels and by the impeachment of Mr. Blackburn, who was the only of Hester's three passengers to testify. Clearly, had the defense acknowledged Hester's apparent errors in judgment, it would have been more credible. Considering, despite the presence of three passengers in Hester's vehicle, the lack of direct evidence of intent and the ambiguity of the circumstantial evidence of the same, the Court cannot dismiss as inconsequential the impact of defense credibility on the verdicts. It therefore concludes that counsel's performance in this respect was also prejudicial.

(Addendum No. 18, p. 146). The post-conviction court ultimately granted relief "[f]inding that counsel were ineffective in pursuing a causation theory" as one of two grounds for the court's decision (Addendum No. 18, p. 152). Counsel's theory was that Hester did not cause the accident killing the victims, but rather the victim's robbing of Hester set the events in motion, and the victims' speed and attempts to prevent Hester from getting in front of them caused the accident.

The Tennessee Court of Criminal Appeals reversed the post-conviction court, finding it "erred by concluding the Hester received ineffective assistance of counsel." *Hester v. State*, 2007 WL 465104 at *10 (Addendum No. 23).

> In the defense's closing arguments, counsel specifically addressed the elements of second degree murder, voluntary manslaughter, and criminally negligent homicide and argued to the jury that Hester was not guilty of those crimes. Although lead counsel did not specifically address reckless homicide, he repeatedly emphasized to the jury that Hester was not guilty of any crime. Like the post-conviction court, we see nothing in the opening and closing statements that the jury would have perceived as abandoning one defense theory for another.

Nevertheless, the post-conviction court, relying heavily on Bruce Poston's assessment of the trial, concluded that the defense rendered deficient performance because it failed to argue Hester was guilty of criminally negligent or reckless homicide. However, as stated by our supreme court, "[i]t cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn.1982). "[T]he reviewing court should avoid the 'distorting effects of hindsight' and 'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn.2001) (quoting *Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66). Similarly, this court should not second-guess tactical and strategic decisions by defense counsel. The fact that a strategy or tactic failed or hurt the defense does not alone support a claim of ineffective assistance of counsel. *Thompson v. State*, 958 S.W.2d 156, 165 (Tenn.Crim.App.1997).

. . . Counsel's decision to argue during closing statements that Hester was guilty of no crime was a strategic decision that should not be second-guessed by a reviewing court. Moreover, the trial court instructed the jury on all of the lesser included offenses of first degree murder, and the jury obviously considered lesser included offenses, finding the Hester guilty of second degree murder. We note that Hester did not have an accident reconstructionist testify at the hearing. Thus, we also conclude that Hester has failed to show he was prejudiced by counsel's not arguing he was guilty of a lesser included offense. The post-conviction court erred by concluding Hester received the ineffective assistance of counsel.

*Hester v. State,* 2007 WL 465104, *10 (Tenn.Crim.App.,2007).

The burden is on Hester to demonstrate that the appellate state court decision was based upon an unreasonable determination of the facts or was an unreasonable application of *Strickland*. The Court is mindful that it "can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). However, as explained below, the record supports the state court's factual findings.

3.    Trial Counsel's Defense Theory

Although defense counsel inquired whether the trial court would provide the jury with a vehicular homicide instruction and the trial court eventually declined to include such an instruction, counsel did not actively pursue a vehicular homicide defense with the jury.  The defense theory was that Hester was robbed by the deceased victims and he was chasing them to retrieve his stolen billfold and $2,200.00.

a.    *Opening Statement*

During his opening statement, counsel stated Hester and his friends were at the Blue Hole and the victims in this case pulled in after them.  Hester's friends were down the steep hill at the water and he was at the car with his wallet when the victims robbed him of his wallet at knife point.[3]  Hester yelled at his friends to come up and told them he had been robbed and he was holding his eye where he had been assaulted.  The victims got in their car and drove up the mountain.  Hester chased them up the mountain and, when they suddenly made a U-turn and headed back down the mountain, Hester followed suit.

Counsel explained the evidence would show that, while the victims were racing down the mountain, they threw the billfold and money out the window.  Hester, however, did not see them throw those items, so he continued to pursue them.  Counsel stated Hester attempted to get ahead of the victims to control their "forward movement" and that he had many opportunities to knock them off the road on the way down the mountain, as had that been his intent, but that his intent was not to knock them off the road but, instead, to stop them to retrieve his billfold and money.

_____

[3]    Hester had recently received a little over $3,000.00 for settlement of a lawsuit and had approximately $2,200.00 in his wallet.

Counsel suggested that the victims themselves caused the deadly accident because of their high rate of speed. Additionally, counsel explained that when Hester tried to pass the victims, they would switch lanes, so the small amount of red paint on Hester's right front fender was a result of the victims moving over and trying to prevent Hester from passing them. Counsel concluded the opening statement by suggesting that the jury would find reasonable doubt as to Hester's guilt of the charged offenses (Addendum No. 3, pp. 196-206).

### b.    *Examination of Witnesses*

Throughout the cross examination of the state's witnesses and examination of defense witnesses, counsel sought to prove that the two male victims in this case robbed Hester of approximately $2200.00 and he chased them to retrieve his money. Counsel presented proof that Hester was trying to get in front of the victims to control their movements but the victims would increase their speed to prevent him from passing them. There was also testimony that the victims were braking, causing Hester to bump into their vehicle, but with insufficient force to cause any substantial damage to the front bumper of Hester's vehicle or back bumper of the victim's vehicle.

In addition, counsel attacked the flawed investigation by the Chattanooga Police Department and brought out their inability to establish the initial point of impact of the victim's vehicle, if any; with what, if anything, the victim's vehicle impacted; or the actual cause of the accident. In addition, counsel's cross-examination revealed there was no debris or anything to indicate any impact between these two cars caused the accident (Addendum No. 5, pp. 349-378). Cross-examination of one of the investigating police

officers revealed that no lab tests were preformed on either of the vehicles (Addendum No. 5, pp. 391-93).

The last witness cross-examined by defense counsel testified on direct that he was northbound (driving toward Signal Mountain) and Hester and the victims' vehicles were southbound (driving away from Signal Mountain) when he saw Hester's vehicle "ramming" the victim's vehicle at least twice. There were no vehicles in front of these two automobiles, both of which were speeding. The witness slowed down and observed Hester back away from the victims, pull up to the left side of the victims' vehicle and turn into the back bumper quarter, spinning the vehicle sideways. The witness testified Hester had a grin on his face and he backed off and the deceased victims' vehicle went behind the witness' car and when he looked in his mirror he saw the car flip across the top of a red Thunderbird. The witness turned around, followed Hester, got his tag number, and returned to the scene of the wreck.

On cross-examination the witness testified the vehicles were 300 to 400 yards away when he first saw them and admitted, at that distance, he was unable to estimate the speed the vehicles were traveling or see the brake lights of the vehicle in front. The witness agreed that, when he saw the last bump, he was unable to see the brake lights on the front car and that the contact was not a hard blow. In addition, he stated he observed Hester's left front bumper hit the victims' right back bumper. The witness conceded that when he saw the victims' car going into oncoming traffic, he was observing everything in his rear view mirror.

At trial, the defense presented the attorney who had previously represented Hester in a civil case to prove that Hester had recently received a cash settlement of more than

19

three thousand dollars. The defense also presented a witness who testified that, as he was driving up the mountain he passed a car and noticed something blow up in the air. As he got closer, he realized it was a billfold and money laying on the ground so he turned around, stopped, and picked it up. The witness kept the money, which he said amounted to $2,242.00, and burned the billfold, Hester's identification, and other papers in the billfold (Addendum No. 6, pp. 487-502).

A witness identified by one of the investigating officers but not called by the state (or even interviewed until two days before she testified for the defense), was a deaf woman who was on her way to work, Terry Lynn Thurman. Ms. Thurman testified she was stopped at the traffic light at the BI-LO store on Signal Mountain Boulevard. She was driving the second vehicle waiting in line at the red light and she observed two guys (through her side-view mirror and her window when she rolled it up) next to her vehicle: one guy who looked like an Indian had a knife behind his back and the other guy had his hands up. She rolled her window up and when the light turned green she drove off (Addendum No. 6, pp.503-527).

David Wayne Blackburn ("Mr. Blackburn"), the defense's final witness, was one of three passengers in Hester's vehicle when this incident took place. Mr. Blackburn testified that Hester left the swimming hole first and walked up to the parked vehicle. Hester was followed by the other two passengers in the car and Mr. Blackburn. When Mr. Blackburn approached the vehicle he observed Hester holding his eye. Hester told Mr. Blackburn to get in the car because the people in the car which was pulling off had just robbed him. Mr. Blackburn said Hester's eye was swelling and it appeared he had been hit in the nose or mouth because he [Mr. Blackburn] saw a little blood.

20

The other car headed up the mountain and Hester followed it and then it whipped around and started down the mountain and Hester did the same. Mr. Blackburn stated that as Hester was trying to stop the car, he would pull up and try to go around the victims' car when oncoming cars were not coming up the mountain. In addition, Hester was blowing his horn trying to get attention and yelling for someone to call the police. Mr. Blackburn testified that when Hester tried to go around the victims' car to get in front of it, the cars bumped quite a few times.

Mr. Blackburn stated that immediately prior to the accident, they almost caught up to the victims' car when it down-shifted, bumped them, and then took off. Mr. Blackburn told Hester he had plenty of gas, so to just follow the car until they stopped. The other car was swerving in and out, trying to keep Hester's car from pulling up beside it and, the last time he swerved over, he slid all the way around, and Hester's car almost hit him, but instead the victims' car slid into the other oncoming traffic.

        c.    *Closing Argument*

The theme of the defense and the proof presented on Hester's behalf was that Hester did not commit a crime and did not cause this fatal accident. Consistent with the defense theme throughout the trial, counsel argued that the lack of major damage to the vehicle supported their contention that Hester was not trying to run the other vehicle off the road. Counsel argued that Hester's intent was to stop the victims and when the victims' and Hester's vehicle collided coming down the mountain. As evidenced by red paint on the front passenger side of Hester's vehicle, it was the result of Hester trying to go around the victims to get ahead of them to control their speed and force them to stop.

21

Counsel argued the state did not prove that the fatal accident was the result of Hester bumping the victims' car because the state's witness who testified he saw the accident and saw Hester smiling was not a credible witness. On cross-examination, trial counsel demonstrated this eyewitness gave a statement to the police shortly after the accident and, in his original statement, he said the two vehicles were bumping each other and he did not mention that Hester was grinning. Counsel further argued that the witness did not see the vehicle go airborne until he passed it because otherwise he would have been involved in the accident.

Counsel argued Hester was not guilty of anything and went through each offense and explained his reasoning. Counsel argued Hester had not committed homicide because he did not cause the wreck; instead, the high rate of speed at which the victims' car was traveling caused the accident (Addendum No. 6, pp. 578-602). Hester maintained this position throughout his state post-conviction proceedings (Addendum No. 19, p. 59-91).

4.    Discussion

During his state post-conviction hearing, Hester testified that when he hired his attorneys, they initially told him they could not save him from going to jail, but thought they could probably reduce his time with a vehicular homicide conviction (Addendum No. 19, p. 66).[4]  Hester testified that once the trial court decided it was not giving a vehicular

_____

[4]       The applicable sections of Tenn. Code Ann. § 39-13-213, Vehicular homicide, provides:
(a) Vehicular homicide is the reckless killing of another by the operation of an automobile, airplane, motorboat or other motor vehicle, as the proximate result of:
(1) Conduct creating a substantial risk of death or serious

22

homicide charge, counsel said they could not argue that position anymore, "so we're going to go with a not guilty verdict." (Addendum No. 19, p. 68).

Trial counsel testified, however, that although they believed a conviction for vehicular homicide would be a good verdict and they requested such a jury instruction, they were always trying for no conviction (Addendum No. 19, p. 8). Neither of Hester's trial attorneys testified that the defense was initially based on vehicular homicide and was only changed to a defense that Hester did not cause the accident after the trial court notified the parties it was not inclined to give the jury such an instruction.

Neither the testimony of trial counsel nor a reading of the record supports Hester's claim that there was a mid-trial change in the theory of the defense. Nothing in the record indicates that the defense was proceeding under a vehicular homicide theory at any time during the trial. Rather, the record reflects that defense counsel's theory throughout the trial was that Hester did not cause the fatal accident. The defense claimed the victims robbed Hester and counsel suggested that had the victims not robbed Hester, as the state claimed, then the victims would have pulled over at one of the businesses they passed and requested assistance, rather than running from Hester. With every witness who observed the accident, counsel attempted to show that no one saw Hester collide the victims just prior to the fatal accident. In addition, counsel demonstrated that there was very little damage to Hester's car, and that the damage which did exist did not support the state's theory that Hester was trying to kill the victims.

---

bodily injury to a person

23

Trial counsel was faced with a case in which Hester maintained he did not cause the accident and one witness testified he did cause it. In light of this evidence, and the lack of physical evidence demonstrating that Hester collided with the victims' car just prior to the accident, it was not unreasonable for counsel to try to portray Hester as merely a victim trying to stop the people he claims robbed him. Although the jury rejected this argument, it was obviously moved to scrutinize the evidence very carefully despite the state's argument that Hester committed first degree murder. Although Hester was indicted on two counts of first degree murder and one count of attempted first degree murder, the jury convicted him on the lesser included offenses of second degree murder and attempted second degree murder.

Hester has not demonstrated that counsel's decision not to argue he was guilty of a lesser included offense was unreasonable since he continued to maintain, even during the state post-conviction hearing, that he did not collide with the vehicle causing the fatal accident. Additionally, Hester has not demonstrated that he gave his attorneys permission to effectively admit his guilt, which they would have done had they argued Hester was guilty of a lesser included offense. *See Wiley v. Sowders*, 669 F.2d 386, 389 (6th Cir. 1982) (An admission of a client's guilt, without prior permission, may constitute ineffective assistance of counsel).

Under the circumstances of this case, trial counsel, both experienced and respected members of the local defense bar, subjected the state's case to adversarial testing and effectively cross-examined all of the state's witnesses. Faced with the decision of whether to maintain Hester did not cause the fatal wreck or acknowledging his actions possibly

caused the wreck, counsel made the strategic decision to rely on the "lack of causation" defense.

Moreover, even assuming counsel were deficient for not acknowledging the recklessness of Hester's conduct, Hester has not demonstrated he suffered any prejudice. The jury was instructed on reckless homicide and had that instruction before them during deliberations, but concluded the crime of second degree murder, a knowing killing, not a reckless killing, was committed.

On habeas review, this Court's task is not to determine whether the state court decision was correct, but whether the decision involved an unreasonable application of *Strickland*. Applying the habeas standard of review, the Court concludes the Tennessee appellate court's determination that counsel made a reasonable strategic decision to pursue a causation defense was not an unreasonable application of *Strickland*.

### B.  Waiver of Twelve-Member Jury

Hester also contends he did not knowingly, intelligently, and voluntarily waive his right to a twelve-member jury. During closing argument, the trial court had to dismiss a juror who was physically ill. The trial court met with counsel in chambers and announced on the record, outside the presence of the jury, that pursuant to dicta in *State v. Bobo*, 814 S.W.2d 353, 359 (Tenn. 1991), it believed Hester could proceed with an eleven-member jury as long as his wavier of a twelve-member jury was "made in writing and with the approval of the court and the consent of the District Attorney General, and that the record should clearly show a voluntary relinquishment of that right." Co-counsel for the defense

announced Hester wanted to proceed with an eleven-member jury. The following colloquy took place:

> COURT: ...[I]t's been brought to my attention that Mr. Hester is willing to go ahead and proceed with the 11-member jury; is that right?

> MR. CAPUTO: That's correct, Your Honor.

> COURT: Okay. I don't think that he's really giving up a right, waiving a right. But to be on the safe side, I prepared a motion to allow waiver of--a motion to allow trial by a jury of 11 members. It says, "Comes the above-named defendant, Harvey Phillip Hester, personally and by his attorney, Leroy Phillips, and moves the Court to allow said defendant to waive a 12-member jury and to submit this case to a jury of 11 members both as to guilt and punishment, pursuant to the provision of Rule 23, Tennessee Rules of Criminal Procedure." It has a place for the defendant's signature, for the attorney for defendant, and approved and concurred in by the Assistant District Attorney General.

> Mr. Hester, is that what you want to do?

> DEFENDANT: Yes, sir.

> COURT: You understand that you have the right at this time to halt the proceedings, the Court will declare a mistrial, this case will be reset for trial for another day; do you understand that?

> DEFENDANT: Yes, sir.

> COURT: And do you also understand that by proceeding, then you are giving up this right to have a mistrial declared, and that you are agreeing to continue; and then if you are convicted of any offense, then, of course, you're giving up the right to raise this as an assignment of error or as an error by the Court in this case; do you understand that?

> DEFENDANT: Yes, sir.

> COURT: And do you have any questions at all about what we're doing here?

> DEFENDANT: No, sir.

COURT: Let me--if you will, hand this to Mr. Hester and let him read this. I'll give you a chance to read this. If you have any questions about it, you can ask your attorneys or you can ask the Court, Mr. Hester.

DEFENDANT: Thank you, sir. (The defendant was given an opportunity to read and sign the document).

COURT: I think my recollection--I don't know, Mr. Phillips, you may know better than I, but Mr. Hester may be the first in Hamilton County to have an 11-member jury, maybe even the first in Tennessee.

MR. PHILLIPS: Right.

COURT: But there's nothing--and I agree with the Supreme Court. There's nothing magic about a 12-member jury, and as long as --of course, you understand also, Mr. Hester, that even though it's an 11-member jury, any verdict in this case would still have to be unanimous?

DEFENDANT: Yes, sir.

COURT: Okay. Do you have any questions, Mr. Hester, at all about this? Is there anything about it that you do not understand, anything at all you want to ask about it at this time?

DEFENDANT: No sir.

COURT: Anything at all that's confusing about it?

DEFENDANT: No, sir.

COURT: Okay. All right, then I will sustain this motion and we will proceed at this time with a jury of 11 members. You may be seated, Mr. Hester.

A defendant has the ultimate authority to determine whether to waive a jury. *Florida v. Nixon*, 543 U.S. 175 (2004). Applying that rule to the instant waiver of a twelve-member jury, the record clearly demonstrates Hester decided to waive the twelve-member jury when he consented to counsel's recommended course of action and voluntarily relinquished his right to be tried by a twelve-member jury.

27

Moreover, the record clearly demonstrates, regardless of whether counsel or the trial judge described the right as constitutional, that the trial judge treated it as such, unequivocally informing Hester he had the right to stop the proceedings and be retried on another day. All the parties involved agreed to the eleven-member jury. The record clearly reflects that counsel advised the trial court that both the State and Hester agreed to proceed with only eleven members. In addition, the record reflects Hester knowingly, intelligently, and voluntarily waived any right he may have had to a twelve-member jury, only after the court made sure he understood that he had "the right at [the] time to halt the proceedings" and if he chose to halt the proceedings the court would declare a mistrial and the case would be set for trial on another day (Addendum No. 6, pp. 613-15).[5]

Clearly, Hester opted to proceed with only eleven jurors after trial counsel and the court advised him that the court was willing to declare a mistrial. Now, however, Hester seemingly contends trial counsel was ineffective for advising him they thought he had a good chance with the eleven jurors and his reliance on counsel's alleged deficient advice rendered his decision to waive the twelve-member jury unknowing, involuntary, and unintelligent. Hester's co-counsel testified they discussed the pros and cons of the witnesses with Hester and what would be involved in a retrial; Hester made the final decision on whether to proceed with the trial; and had Hester requested a mistrial they would have gone along with that decision (Addendum No. 19, p. 58-59). Counsel testified that in hindsight, he would have advised Hester to go with a mistrial. However, counsel's

---

[5]        In *Williams v. Florida*, 399 U.S. 78, 86 (1970) the Supreme Court held that a state may utilize a six-person jury consistent with the Sixth Amendment's guarantee of a trial by jury. The Court affirmed the order denying habeas relief because the habeas Hester was not constitutionally entitled to a twelve-person jury.

opinion in hindsight is insufficient to demonstrate Hester's waiver was unconstitutional and there is nothing in the record demonstrating counsel's opinion and advice to proceed with the eleven-member jury render Hester's waiver unknowing, involuntary, or unintelligent.

The Court is required to give a high measure of deference to the state court's finding concerning the jury waiver, which is supported by the contemporaneous record in the case. The state appellate court's finding of a valid waiver of a twelve-member jury was not rebutted by "clear and convincing" evidence, as required to obtain habeas relief. *See Rickman v. Bell*, 131 F.3d 1150, 1153-54 (6th Cir. 1997).

Accordingly, the state court decision finding a constitutional waiver is not based on an unreasonable determination of the facts nor was it contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Thus, Hester is not entitled to any habeas relief on his claim that his waiver of a twelve-member jury was unconstitutional.

## VI. CONCLUSION

Respondent's Motion to Dismiss [Court doc. 8] is **GRANTED.**

Hester's § 2254 petition [Court Doc. 1] is **DISMISSED**.

SO ORDERED.


_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE